## Hursh Estate

*High, Swartz, Roberts & Seidel,* and *Dechert, Price & Rhoads,* for accountants.

*Drew J. T. O'Keefe* and *Joseph R. Ritchie, Jr.,* for United States of America, and *Anthony J. Giangiulio,* for claimants.

TAXIS, P. J., July 29, 1966.—The United States of America appears in this proceeding as a claimant for the sum of $7,726. This amount represents monthly annuity payments made to decedent under the Railroad Retirement Act of June 24, 1937, 50 Stat. 307, as amended, 45 U. S. C. A. §228a, as amended, for the period April 1959 through May 1962, inclusive. It is the contention of the United States that these payments were made by mistake, as decedent was not entitled to an annuity under the provisions of the act, and that, therefore, they now may be recovered from his estate. Counsel for both sides have stipulated the relevant facts.

Mr. Hursh was employed by the Pennsylvania Railroad from 1916 until March 31, 1959, when he retired. During this period, he invented several devices or mechanisms relating to the operation and maintenance of railroads, all of which were made available free of cost for use by the Pennsylvania Railroad while he was employed by it. One of these inventions was a ballast-tamping apparatus, a patent for which was applied for in 1948 and received in 1952 by decedent and

another person, from whom, however, Hursh acquired all rights by assignment.

In 1951, as sole owner of this device, Mr. Hursh granted Railway Maintenance Corporation a license to sell and install the same, in return for certain specified royalty payments. On March 5, 1952, a business corporation known as Hursh Associates, Inc., was created, with decedent, his wife and two children as officers, directors and shareholders. Two months later, in May 1952, Hursh transferred his rights under the license agreement with Railway Maintenance Corporation to Hursh Associates, which agreement became thereby the sole asset of the family corporation, a situation which still prevails. The consideration for the transfer was $600,000, to be paid by Hursh Associates in installments over a period of 17 years. Decedent also received dividends from the corporation from time to time, and was employed by it from 1952 until his death as president and general manager at a salary of $8,000 per year.

During and after the above occurrences, until 1959, Hursh continued with the Pennsylvania Railroad as his principal employment. With reference to his personal business affairs, he expended such time and effort as was needed to review the periodic statements which Railway Maintenance Corporation submitted to him, from which its payment to Hursh Associates were determined, and also had other correspondence with Railway Maintenance Corporation. For Hursh Associates, he issued and signed salary, tax, dividend and other checks, attended to the preparation of corporate tax returns and to the quarterly returns required by the Social Security Administration, in which he listed himself as an employe and with which he paid Social Security taxes on his salary. Beyond these activities, there was little to be done in the operation of Hursh Associates.

Decedent applied for his railroad retirement annuity on April 1, 1959, and, in so doing, signed an application, on which, however, an employe of the railroad retirement board had inserted most of the information. Question 11(a) on this application asked: "Have you worked for anyone since you stopped working for your last employer in the railroad industry?" Question 11(b) asked: "Did you work for anyone outside the railroad industry within the last twelve months during which you worked in the railroad industry?" To both of these questions Mr. Hursh answered "No".

The following statutory language, appearing in section 2 of the Railroad Retirement Act, 50 Stat. 309, as amended, 45 U. S. C. A. §228(b), is relevant:

"(a) The following-described individuals . . . shall, subject to the conditions set forth in subsections (b)-(d) of this section be eligible for annuities after they shall have ceased to render compensated service to any person, whether or not an employer as defined in section 1(a) (but with the right to engage in other employment to the extent not prohibited by subsection (d) . . .)

"(b) An annuity shall be paid only if the applicant shall have relinquished such rights as he may have to return to the service of an employer and of the person by whom he was last employed . . .

"(d) No annuity shall be paid with respect to any month in which an individual in receipt of an annuity hereunder shall render compensated service to an employer or to the last person by whom he was employed prior to the date on which the annuity began to accrue".

Section 9 of the aforesaid act, 50 Stat. 314, as amended, 45 U. S. C. A. §228i, reads as follows:

"(a) If the Board finds that at any time more than the correct amount of annuities, pensions, or death benefits has been paid to any individual . . . or a

payment has been made to an individual not entitled thereto . . ., recovery by adjustments in subsequent payments to which such individual is entitled under any Act administered by the Board may, except as otherwise provided in this section, be made under regulations prescribed by the Board. If such individual dies before recovery is completed, recovery may be made by set-off or adjustments, under regulations prescribed by the Board, in subsequent payments due, under any Act administered by the Board, to the estate, designee, next of kin, legal representative, or surviving spouse of such individual, with respect to the employment of such individual".

The last-quoted section relates to the initial problem to be dealt with. The estate contends that under its provisions the United States Government may not recover in this court as a common-law creditor, as its remedy under its own laws is limited to adjustments to subsequent payments, either to the annuitant or to those succeeding to his interests. The estate points to the absence of any authorization to recover erroneous payments from an annuitant's estate, and contends that claimant is attempting here to go outside the provisions of section 9.

The United States replies to this with convincing citations. In United States v. Wurts, 303 U. S. 414, 415, 416, the Supreme Court said this:

"The Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid. 'No statute is necessary to authorize the United States to sue in such a case. The right to sue is independent of statute, . . .' United States v. Bank of the Metropolis, 15 Pet. 377, 401, . . . The Government's right to recover funds, from a person who received them by mistake and without right, is not barred unless Congress has 'clearly manifested its intention' to raise a statutory barrier".

We cannot agree that Congress has "clearly manifested its intention" to bar the United States from pursuing the present claim, by merely omitting to refer to its right to do so in the Railroad Retirement Act, especially where a general right to do so has long existed. We think the provisions of section 9 are to permit the disposition of these matters at an administrative level where circumstances allow, since the absence of such provisions might well require the United States to resort to the courts each and every time for the correction of erroneous payments. We hold, therefore, that the United States has standing here to press its claim.

We come now to a consideration of the merits. The estate contends, in general, that the purpose of the Railroad Retirement Act is to free jobs for the general labor market, and that if an annuitant does this, he thereby becomes entitled to benefits. From this, the estate asks the court to conclude that decedent's retirement from his position with the Pennsylvania Railroad, and his relinquishment of all of his rights to return, qualified him for payments under the act. The estate further points out that, in serving as president and general manager of Hursh Associates, decedent took no job from the general labor market, inasmuch as he was merely implementing his own personal determination to use the corporate form for handling his personal business affairs. The estate finally contends that, in any event, decedent never rendered any "compensated service" to the corporation as that term has been construed.

A study of the statutory language seems to require the following for a person to become entitled to payments under the act: (1) A claimant must cease "to render compensated service to any person" in order to qualify initially; (2) in so doing, he must at that time give up all rights to return to railroad work or to the

service of his last employer, and (3) prospectively, he loses benefits for any month in which he works for a railroad or for the last person by whom he was employed prior to retirement. This first means that an annuitant must cease all compensated service in order to qualify initially, and if he has more than one employer at this time, he must give up them all: United States v. Bush, 255 F. 2d 791 (C. A. 3). And it means, in effect, that if an annuitant returns to work after retiring, he must obtain what amounts to a brand new job outside the railroad industry in order to retain his annuity.

The issue, then, comes down to this: Was decedent rendering "compensated service" to Hursh Associates in April 1959? An inspection of the cases cited in this matter convinces us that he was. Unquestionably, the services actually performed were limited, but they had to be performed by someone, and United States v. Bush, supra, requires the cessation of all compensated service. In Social Security Board v. Nierotko, 327 U. S. 358, 365, the Supreme Court construed the concept of "service" broadly, in concluding that a back pay award to a wrongfully discharged employe should be included in his earnings record for Social Security purposes, although the employe actually did no work for the back pay. The court said:

"We think that 'service' as used by Congress in this definitive phrase means not only work actually done but the entire employer-employee relationship for which compensation is paid to the employees by the employer".

The estate contends that no such broad definition of "compensated service" is found in the Railroad Retirement Act and that this case is, therefore, inapplicable. However, although it is true that there are here two separate enactments, nevertheless they are in many ways similar both in purpose and operation, and nothing requires different meanings to be ascribed to the same

words merely because in one case statutory definition is more complete than in the other. That this broad construction is applicable regardless of its effect on the annuitant appears from the holding in Kore v. Celebrezze, 342 F. 2d 638 (C.A. 7), where an employe was excluded from benefits for a month in which he had done no work but in which he had received a payment of $500 from his employer. The court said, at page 640:

"In the same sense that the employee in Nierotko was found to have rendered service after an unlawful discharge, Kore in the instant case rendered service during a month when he performed no actual work. Both employees continued in an unbroken tenure of employment and thus continued to render service although not actually performing any work".

And in Berkley v. Folsom, CCH UI Rep., Fed., par. 8203, it was held that a person who retired, but who retained the office of president of her corporation, including the right to handle personnel, and who advised and assisted the new general manager of the business, was rendering services which excluded her from receiving Social Security benefits.

The estate urges that the above broad construction of the concept of "service" under the Social Security Act in this case here frustrates rather than furthers the purpose of the Railroad Retirement Act, and asks this court to disregard the cases decided under the Social Security Act. We do not feel free to do this. In the first place, by far the greater part of available authority is under the latter act. In the second place, reference to a supposed statutory policy or purpose is not sufficient to offset clear and understandable language, especially as construed and applied by judicial decision. The record is clear that the only person who contributed services, time or effort to the operation of Hursh Associates, no matter how little or how much was required, was decedent, with the result that he must be found to

have rendered compensated service to the corporation for the entire period of his employment by it.

The estate also argues that, under section 2(d), the burden is on claimant to establish in which months decedent rendered compensated service to Hursh Associates. We have, however, held that Mr. Hursh was not initially entitled to the annuity and, therefore, need not reach this point. It does appear, however, that the same considerations which have been held to determine what constitutes "compensated service" under subsection (a) would apply to the application of subsection (d), and, accordingly, Mr. Hursh's continuous employment as president and general manager of Hursh Associates would satisfy its conditions as well.

It must be admitted that this is a close case. There is not the slightest suggestion that Mr. Hursh's statements were other than honest mistake, at most; indeed, the existence of Hursh Associates and his relationship to it were well known to many people far outside of his immediate family. In addition, there is appeal in the contention of the estate that this matter should not be determined by the technical form in which decedent handled his personal business, and that Mr. Hursh could have handled all of his affairs without being employed by anybody. Nevertheless, he did create a corporation, and he was employed by it; and even though many matters which are in fact handled through and by the device of corporations could be accomplished otherwise, yet once a corporation has come into existence, it cannot be turned on and off solely to suit the momentary advantage of its creator. Accordingly, the claim of the United States is sustained, and the sum of $7,726 awarded to it. . . .

And now, July 29, 1966, this adjudication is confirmed nisi.