John W. GARDNER, Secretary of Health, Education and Welfare, Appellant,

v.

Vaud A. TRAVIS, Appellee.

No. 9356.

United States Court of Appeals
Tenth Circuit.

Dec. 19, 1967.

**510**

Walter H. Fleischer, Washington, D. C. (Carl Eardley, Washington, D. C., Bruce Green, Muskogee, Okl., and John C. Eldridge, Washington, D. C., on brief), for appellant.

William D. Lunn, Muskogee, Okl. (Andrew C. Wilcoxen, Muskogee, Okl., on brief), for appellee.

Before MURRAH, Chief Judge, and PHILLIPS and LEWIS, Circuit Judges.

MURRAH, Chief Judge.

This suit was brought pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), by Vaud A. Travis, appellee, to review a final decision of the Secretary of Health, Education and Welfare, imposing deductions against his old-age insurance benefits for all months during the years 1963, 1964 and 1965. Reversing the administrative decision, the district judge determined that deductions were unauthorized for certain of the months in question. The Secretary has appealed.

Some understanding of the scheme of certain pertinent parts of the Social Security Act and a statement of the operative facts are essential to a statement of our decisive question. Section 203(c), 42 U.S.C. § 403(c), requires deductions from an individual's old-age benefits for any month "in which such individual is under the age of seventy-two and on seven or more different calendar days * * * [engages] in noncovered remunerative activity outside the United States." Sections 203(b) and (f) dictate benefit deductions for any month in which an individual's earnings from wages exceed $125, unless, as provided in Section 203(f) (1) (D), the individual did not, in such month, *"render services for wages * * * of more than $125."* (Emphasis added.) "Wages" is defined by Section 209 as "remuneration * * * for employment." "Employment" in turn is defined in Section 210(a) as "any service, of whatever nature, performed after 1950 either (A) by an employee for the person employing him, irrespective of the citizenship or residence of either, (i) within the United States, * * * or (B) outside the United States by a citizen of the United States as an employee (i) of an American employer * * * or (ii) of a foreign subsidiary * * * of a domestic corporation * * *."

The pertinent facts of record show that Travis is a recognized authority in the field of business organization, communication and human relations. Upon his retirement in 1962 from the faculty of Northeastern State College at Tahlequah, Oklahoma, he was employed as a management consultant by Riley's Reproductions, Inc., a Canadian firm, at a monthly salary of $600, later raised to $700.[1]

---

1. The employment arrangement was set forth in a letter from Riley's to Travis dated August 11, 1961, as follows:

    "This letter will confirm the arrangements made with you relative to your employment with Riley's Reproductions, Inc., a wholly owned subsidiary of this Company * * *.

    (1) Riley's Reproductions, Inc. will enter into a contract with you engaging you as an employee at a monthly salary of $600.00 (U.S. Funds) for the

By the terms of his employment, Travis was to be available to go to Canada on call. He actually made about six trips per year to Canada, each lasting for a period of ten to sixteen days. While there Travis spent approximately sixty to ninety hours per week teaching "the basic principles of [Riley's] operation * * * to their management and * * * supervisory forces." He would then "do enough observation of the manner in which they made application of these principles to know whether they [understood them]." Travis testified that he had developed the techniques taught and utilized at Riley's over a period of fifty years of research and study.

Between assignments in Canada, Travis resided at his home in Tahlequah, Oklahoma, where he engaged in research for about forty hours a week. He testified that "the research * * * I do is to enrich my life, to make me more valuable to the people with whom I come in contact, rather than for this specific company." He stated that less than 5% of his reading and studying is directly attributable to Riley's specific problems. While at home in Oklahoma, Travis also placed four to six long distance telephone calls and wrote eight to twelve letters each month to his employer in Canada, primarily acknowledging receipt of letters or reports or asking for additional information.

Travis admits that deductions from his old-age benefits are appropriate under Section 203(c) for the months he worked outside the United States in Canada. The decisive question on appeal is whether Travis "render[ed] services for wages" within the meaning of Section 203(f) (1) (D) during the months he remained in the United States. If not, then benefit deductions are not warranted for those months.

The Social Security Administration initially determined that although Travis was eligible for old-age insurance benefits due to his age and past earnings, no benefits were payable to him because of his present "work and earnings." Upon reconsideration this determination was sustained, and, at Travis' request, a hearing was thereafter held before an examiner of the Bureau of Hearings and Appeals. The hearing examiner ruled that although Travis did substantially less for his employer while at home than while in Canada, he was nevertheless precluded from receiving benefits during the Oklahoma months because he failed to meet the burden of proving that he was in a "retired status" during those months. See Norment v. Hobby, D.C., 124 F.Supp. 489; Thurston v. Hobby, D.C., 133 F.Supp. 205. Moreover, the examiner seemed to think that to permit an individual such as Travis to receive benefit payments would defeat the paramount purpose of the Social Security Act

period from September 1st, 1961 to August 1st, 1965;

(2) The employment contract will provide that:

(a) you will devote your full time and attention to the affairs of Riley's Reproductions, Inc. and that you will carry out the lawful instructions of the Board of Directors of that Company;

(b) in the event of your death during the term of employment the contract will terminate and your legal personal representative will be paid an additional three (3) months remuneration;

(c) in the event of your becoming physically or mentally incapacitated during the term of employment so as to prevent you from devoting your full time and attention to the affairs of Riley's Reproductions, Inc. that Company may terminate the employment contract and in such event you will be paid remuneration for an additional three (3) months from the date of such termination;

(d) to the extent that you are eligible for fringe benefits available to the employees of Riley's Reproductions, Inc. such fringe benefits will be provided in addition to the remuneration above mentioned;

(3) In the event that you are unable to terminate your present employment by September 1st, 1961, the commencement date of the contract above mentioned will be extended to the date on which you are available to become an employee of Riley's Reproductions, Inc.;

(4) * * *

(5) * * *."

"to provide funds through contributions by employer and employee for the decent support of elderly workmen who have ceased to labor." Social Security Board v. Nierotko, 327 U.S. 358, 364, 66 S.Ct. 637, 640, 90 L.Ed. 718. The decision of the hearing examiner was adopted by the Appeals Council as the final decision of the Secretary.

In reversing the administrative determination, the trial court held that no deductions were appropriate during the months Travis spent in Oklahoma. The judge deemed Section 210(b) controlling, and based his ruling upon that Section, which provides that: "If the services performed during one-half or more of any pay period [2] by an employee for the person employing him constitute employment, all the services of such employee for such period 'shall be deemed to be employment; but if the services performed during more than one-half of any such pay period by an employee for the person employing him do not constitute employment, then none of the services of such employee for such period shall be deemed to be employment." Applying this Section, he reasoned that "with the record showing that about 5% of [Travis'] monthly activity in the United States might constitute services for his employer, Section [210(b)] would apply to exclude entirely consideration of his at home activity." We take this to mean that since less than one-half (i. e., about 5%) of all the research and study performed by Travis in Oklahoma was for Riley's, none of the research constituted "employment", and deductions were thus unwarranted during the Oklahoma months.

On appeal, the Secretary denies that Section 210(b) is of any relevance whatsoever in determining whether deductions should be made from old-age benefits, and asserts that the trial judge erred in applying it to exclude a consideration of the Oklahoma services. We are cited no case and, indeed, have found none, shedding any light upon the meaning of Section 210(b). It therefore becomes necessary to carefully examine its role in the legislative scheme.

As we have seen, Section 210(a) gives a broad general definition of the word "employment" as that term is used in the Act. It concludes by listing nineteen types of services which are not included within the term "employment". Selected examples of these "excluded" services are agricultural service by a foreign worker, domestic service in a college fraternity, and service performed in the employ of a foreign government. Section 210(b) is, significantly, entitled "Included and Excluded Service." Following as it does upon the heels of Section 210(a) defining the services that are included within and excluded from the term "employment," and being captioned as it is, Section 210(b) presumably should prescribe the rules to be applied in a situation where an individual performs both an included service and an excluded one. That such was the intent of Congress is made inescapably clear by the House Report accompanying the 1939 amendments to the Social Security Act. Referring to Section 210(b), the Report states: "The law is changed with respect to services of an employee performing both included and excluded employment for the same employer so that the services which predominate in a pay period determine his status with that employer for that period. H.Rep. 728, 76th Cong., 1st Sess., p. 18.

■■■ When the language of Section 210(b) is read in its proper context in the Act, and is viewed in the light of the legislative purpose for which it was enacted, it becomes apparent, we think, that the Section applies only where an employee performs, for the same employer, both an included and an excluded service within the meaning of Section 210(a). Any services performed by Travis for Riley's during the Oklahoma months are services clearly included within the

2. "Pay period" is defined by the same section as "a period (of not more than thirty-one consecutive days) for which a payment of remuneration is ordinarily made to the employee by the person employing him."

broad 210(a) definition of "employment" —Travis performed no service which could be classified as one of the nineteen "excluded" services. It follows that the instant case cannot be said to present a Section 210(b) situation, and we think the trial judge erroneously applied that Section to exclude the Oklahoma services from consideration in the determination of benefit deductions.

■ Moreover, Section 203(f) (5) (C) expressly makes the dictates of Section 210 inapplicable to the determination of benefit deductions. That Section provides that in computing an individual's wages for the purpose of making benefit deductions, "services which do not constitute employment as defined in section [210] of this title, performed *within the United States* by the individual as an employee * * *, shall be deemed to be employment as so defined if the remuneration for such services is not includible in computing his net earnings or net loss from self-employment." (Emphasis added). In our words, even if a service does not fall within the Section 210(a) definition of "employment", Section 203(f) (5) (C) requires that the wages received from the performance of that service be considered in determining whether benefit deductions are warranted. . The trial judge took note of Section 203(f) (5) (C), but concluded that it was inapplicable because limited to services "performed within the United States", and he interpreted Section 210(b) to exclude consideration of the Oklahoma services. Since, however, we have concluded that Section 210(b) does not preclude a consideration of any services performed in Tahlequah, the judge's premise must fall.

We finally reach our decisive question whether Travis "render[ed] services for wages" within the meaning of Section 203(f) (1) (D) during the Oklahoma months so as to require benefit deductions during those months. Travis interprets this phrase to mean that the services must be rendered "in exchange" for the wages. He argues that the checks he received during the months he resided in Oklahoma were compensation for the services he performed while in Canada, not payment for any services rendered in Oklahoma; that he is paid monthly only for the accounting convenience of his employer; and, in any event, assuming that part of each Oklahoma check is for services rendered in Oklahoma, only that portion of the compensation representing wages for the Oklahoma services can be charged against his benefits. The Secretary, on the other hand, contends that when an individual performs services in a month and receives a salary of more than $125 in the month, he is literally "render[ing] services for wages" and deductions from his benefits are proper.

Although the term "service" is not defined by the Act, its meaning was defined by the Supreme Court in Social Security Board v. Nierotko, supra. There the Court was faced with the question whether back pay awarded in an unfair labor practice proceeding to a wrongfully discharged employee constituted "wages" for which the employee was entitled to credit on his Old-Age and Survivors' Insurance account. In ruling that the back pay did constitute wages, the Court thought that " 'service' * * * means not only work actually done but the entire employer-employee relationship for which compensation is paid to the employee by the employer." 327 U.S. at 365, 366, 66 S.Ct. at 641.

In Kore v. Celebrezze, 342 F.2d 638, the Seventh Circuit rejected the argument that the phrase "render services for wages" means the services must be rendered in exchange for the wages. Kore was a motion picture operator. When the advent of television created adverse business conditions in the motion picture industry, Kore's union made an agreement with motion picture theaters to spread available work among its members. Under the agreement, each union member was "laid off" for eight weeks so that all would have as full employment as possible. Kore was laid off during August and performed no services during that month, but received a

check for $500 for the month. Relying upon the Nierotko definition of "service", the Seventh Circuit found that Kore did render services for wages within the meaning of Section 203(f) (1) (D) during August, and was not entitled to insurance benefits for that month. Speaking for his Court, Judge Swygert rationalized: "In the same sense that the employee in Nierotko was found to have rendered service after an unlawful discharge, Kore in the instant case rendered service during a month when he performed no actual work. Both employees continued in an unbroken tenure of employment and thus continued to render service although not actually performing any work." Id. at 640.

■■ We agree with Judge Swygert that so long as an employee continues in an unbroken chain of employment, he is "render[ing] services for wages" within the meaning of Section 203(f) (1) (D) although performing no work. Armour & Co. v. Wantock, 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118. This conclusion, however, must be read in conjunction with Section 209(i) of the Act, which provides that the term "wages" shall not include "any payment (other than *vacation* or sick *pay*) made to an employee after the month in which he attains age 62 (if a woman) or age 65 (if a man), if he did not work for the employer in the period for which such payment is made." (Emphasis added.) At first glance, the Kore holding appears to fly directly in the face of this Section, since the $500 check received by Kore in August was deemed to be wages even though no work was actually performed during that month. A careful reading of the Kore decision, however, illustrates that Judge Swygert considered the $500 check to be in the nature of "vacation pay", an express exception to Section 209(i).

■ We think Section 209(i) and the Kore interpretation of the phrase "render services for wages" in Section 203(f) (1) (D) must be read together in determining the appropriateness of benefit deductions. As we read them, if a claimant is under age 65[3] and engaged in an unbroken tenure of employment, benefit deductions are appropriate for any month in which remuneration in excess of $125 is received, regardless of whether or not any work was done for the employer. If the claimant is over age 65, benefit deductions are not warranted during any month in which the claimant did no work for his employer, even though in excess of $125 is received. The doing of any work whatsoever during such a month, however, will compel benefit deductions for the month.

■ Since Travis is over age 65, the narrow issue is whether he did any work whatsoever for Riley's during the Oklahoma months. If not, he did not "render services for wages" as contemplated by the Act. The Secretary found, on the basis of a letter from Riley's[4] and

---

3. A male claimant can begin drawing reduced old-age insurance benefits at age 62. See Section 202(a), 42 U.S.C. § 402(a).

4. Riley's President submitted a written statement to the Social Security Administration in 1964 describing Travis' services in the following manner:

"Mr. Travis is scheduled this year to work in our office in Calgary and some of our various branches approximately two weeks out of each eight to ten weeks. The balance of his time is spent at his home in Tahlequah and while there he works on various projects subsequent to his last and in preparation for his next trip. We actually consider Mr. Travis a full time employee even though he spends three-fourths or a little better of his time at his home rather than at the office. * * * His work is in the field of personnel and human relations for which he has a very extensive background and experience. He does not need to devote all of his time when away from our offices to meet our requirements. In this sense he undoubtedly does not work on a full time schedule in the usual meaning."

It should be noted that Riley's President later submitted to the trial judge a contradictory affidavit as follows:

"Dr. Travis is paid by this company the sum of $700.00 per month under an agreement to perform services for us in

other pertinent evidence that Travis did render some services for his Canadian employer in Oklahoma. But inasmuch as the trial judge had no occasion to consider this question in the light of our interpretation of the law, it seems appropriate to remand the case for reconsideration and resolution in view of the facts of record, or, if further evidence is deemed appropriate to a decision in the case, the court may also proceed in accordance with Section 205(g) of the Act.

an advisory capacity. In addition to his pay as aforesaid, he receives his transportation and subsistence. The services which Dr. Travis performs are rendered to us wholly in Canada and specifically in Vancouver, Edmonton, Regina and Calgary. He performs no services for us in the United States of America. The very nature of his work requires him to be in a face to face situation with our people here. The method of payment and the distribution of payment over the year is purely a matter of convenience to both of us."