ARMOUR & CO. *v.* WANTOCK ET AL.

No. 73.   Argued October 13, 1944.—Decided December 4, 1944.

*Mr. Paul E. Blanchard,* with whom *Messrs. Chas. J. Faulkner, Jr.* and *R. F. Feagans* were on the brief, for petitioner.

*Mr. Ben Meyers* for respondents.

*Solicitor General Fahy, Mr. Douglas B. Maggs,* and *Miss Bessie Margolin* filed a brief on behalf of the Administrator of the Wage and Hour Division, U. S. Department of Labor, as *amicus curiae,* urging affirmance.

MR. JUSTICE JACKSON delivered the opinion of the Court.

Armour and Company, petitioner, has been held liable to certain employees for overtime, liquidated damages,

and attorneys' fees under the Fair Labor Standards Act. 140 F. 2d 356. The overtime in question is that spent on the employer's premises as fireguards subject to call, but otherwise put to such personal use as sleeping or recreation. The Court of Appeals for the Fifth Circuit on facts of considerable similarity reached an opposite result, in *Skidmore* v. *Swift & Co.*, 136 F. 2d 112, *post*, p. 134. To resolve the conflict we granted certiorari in both cases. 322 U. S. 723.

Armour and Company operates a soap factory in Chicago which produces goods for interstate commerce. It maintains a private fire-fighting force to supplement that provided by the city. The respondents were employed as fire fighters only, and otherwise had nothing to do with the production of goods. They were not night watchmen, a separate force being maintained for that purpose. They were not given access to the factory premises at night except by call or permission of the watchmen.

These men worked in shifts which began at 8:00 a. m., when they punched a time clock. The following nine hours, with a half hour off for lunch, they worked at inspecting, cleaning, and keeping in order the company's fire-fighting apparatus, which included fire engines, hose, pumps, water barrels and buckets, extinguishers, and a sprinkler system. At 5:00 p. m. they "punched out" on the time clock. Then they remained on call in the fire hall, provided by the Company and located on its property, until the following morning at 8:00. They went off duty entirely for the next twenty-four hours and then resumed work as described.

During this nighttime on duty they were required to stay in the fire hall, to respond to any alarms, to make any temporary repairs of fire apparatus, and take care of the sprinkler system if defective or set off by mischance. The time spent in these tasks was recorded and amounts on average to less than a half hour a week. The employer

does not deny that time actually so spent should be compensated in accordance with the Act.

The litigation concerns the time during which these men were required to be on the employer's premises, to some extent amenable to the employer's discipline, subject to call, but not engaged in any specific work. The Company provided cooking equipment, beds, radios, and facilities for cards and amusements with which the men slept, ate, or entertained themselves pretty much as they chose. They were not, however, at liberty to leave the premises except that, by permission of the watchman, they might go to a nearby restaurant for their evening meal.

A single fixed weekly wage was paid to the men, regardless of the variation in hours per week spent on regular or on firehouse duty, the schedule of shifts occasioning considerable variation in weekly time.

This fire-fighting service was not maintained at the instance of the Company's officials in charge of production, but at that of its insurance department. Several other plants of Armour and those of numerous other manufacturers in the same industry produce similar goods for commerce without maintaining such a fire-fighting service.

On these facts the petitioner contends: first, that employees in such auxiliary fire-fighting capacity are not engaged in commerce or in production of goods for commerce, or in any occupation necessary to such production within the meaning of the Act; and, second, that even if they were within the Act, time spent in sleeping, eating, playing cards, listening to the radio, or otherwise amusing themselves, cannot be counted as working time. The employees contended in the District Court that all of such stand-by time, however spent, was employment time within the Act, but they took no appeal from the judgment in so far as it was adverse to them.

The District Court held that the employees in such service were covered by the Act. But it declined to go

to either extreme demanded by the parties as to working time. Usual hours for sleep and for eating it ruled would not be counted, but the remaining hours should. Judgment was rendered for Wantock of $505.67 overtime, the same amount in liquidated damages, and $600 for attorneys' fees; while Smith recovered $943.07 overtime, liquidated damages of equal amount, and attorneys' fees of $650. The Court of Appeals affirmed.

*First.* Were the employees in question covered by the Fair Labor Standards Act? Section 7 of the Act, 29 U. S. C. § 207, by its own terms applies maximum hours provisions to two general classes of employees, those who are engaged in commerce and those who are engaged in producing goods for commerce. Section 3 (j), 29 U. S. C. § 203 (j), adds another by the provision that "an employee shall be deemed to have been engaged in the production of goods if such employee was employed . . . in any process or occupation necessary to the production" of goods for commerce. The courts below held that the respondents were included in this class. The petitioner seeks to limit those entitled to this classification by reading the word "necessary" in the highly restrictive sense of "indispensable," "essential," and "vital"—words it finds in previous pronouncements of this Court dealing with this clause. *Kirschbaum Co.* v. *Walling,* 316 U. S. 517, 524–26; *Overstreet* v. *North Shore Corp.,* 318 U. S. 125, 129, 130. These and other cases, says petitioner, indicate that in applying the Act a distinction must be made between those processes or occupations which an employer finds advantageous in his own plan of production and those without which he could not practically produce at all. Present respondents, it contends, clearly fall within the former category because soap can be and in many other plants is produced without the kind of fire protection which these employees provide.

The argument would give an unwarranted rigidity to the application of the word "necessary," which has always

been recognized as a word to be harmonized with its context. See *McCulloch* v. *Maryland,* 4 Wheat. 316, 413, 414. No hard and fast rule will tell us what can be dispensed with in "the production of goods." All depends upon the detail with which that bare phrase is clothed. In the law of infants' liability, what are "necessaries" may well vary with the environment to which the infant is exposed: climate and station in life and many other factors. So, too, no hard and fast rule may be transposed from one industry to another to say what is necessary in "the production of goods." What is practically necessary to it will depend on its environment and position. A plant may be so built as to be an exceptional fire hazard, or it may be menaced by neighborhood. It may be farther from public fire protection, or its use of inflammable materials may make instantaneous response to fire alarm of peculiar importance to it. "Whatever terminology is used, the criterion is necessarily one of degree and must be so defined." *Santa Cruz Co.* v. *Labor Board,* 303 U. S. 453, 467; *Kirschbaum Co.* v. *Walling,* 316 U. S. 517, 526. In their context, the restrictive words like "indispensable," which petitioner quotes, do not have the automatic significance petitioner seeks to give them. What is required is a practical judgment as to whether the particular employer actually operates the work as part of an integrated effort for the production of goods.

The fact that respondents were hired by an employer which shows no ostensible purpose for being in business except to produce goods for commerce is not without weight, even though we recognized in *Kirschbaum Co.* v. *Walling* that it might not always be decisive (316 U. S. at 525). A court would not readily assume that a corporation's management was spending stockholders' money on a mere hobby or an extravagance. The company does not prove or assert that this fire protection is so unrelated to its business of production that it does not for income-tax

purposes deduct the wages of these employees from gross income as "ordinary and necessary expenses" (Int. Rev. Code § 23 (a) (1)). The record shows that this department not only helps to safeguard the continuity of production against interruption by fire but serves a fiscal purpose as well. Without the department, insurance could not be obtained at any price except by employing enough watchmen to make hourly rounds; with it, only enough watchmen for rounds every two hours are needed. This saves twelve watchmen, or about $17,600 a year, and reduces insurance premiums by $1,200 a year. What the net savings are has not been stipulated, but it is clear that this so-called "de luxe" service is maintained because it is good business to do so. More is necessary to a successful enterprise than that it be physically able to produce goods for commerce. It also aims to produce them at a price at which it can maintain its competitive place, and an occupation is not to be excluded from the Act merely because it contributes to economy or to continuity of production rather than to volume of production.

If some of the phrases quoted from previous decisions describe a higher degree of essentiality than these respondents can show, it must be observed that they were all uttered in cases in which the employees were held to be within the Act. A holding that a process or occupation described as "indispensable" or "vital" is one "necessary" within the Act cannot be read as an authority that all which cannot be so described are out of it. *McLeod* v. *Threlkeld*, 319 U. S. 491, which did exclude the employee from the scope of the Act, is not in point here because it involved application of the other clause of the Act, covering employees engaged "in commerce," and the test of whether one is in commerce is obviously more exacting than the test of whether his occupation is necessary to production for commerce.

But we think the previous cases indicate clearly that respondents are within the Act. *Kirschbaum Co.* v. *Wall-*

*ing, supra,* held that watchmen, as well as engineers, firemen, carpenters and others, were covered, because they contributed to "the maintenance of a safe, habitable building" which was, in turn, necessary for the production of goods. Again, in *Walton* v. *Southern Package Corp.,* 320 U. S. 540, the "necessary for production" clause was held to cover a night watchman for a manufacturing company, and we pointed to the reduction of fire insurance premiums as evidence that a watchman "would make a valuable contribution to the continuous production of respondent's goods." The function of these employees is not significantly different.

The courts below did not err in holding that respondents were employed in an occupation reasonably necessary to production as carried on by the employer and hence were covered by the Act.

*Second.* Was it error to count time spent in playing cards and other amusements, or in idleness, as working time?

The overtime provisions of the Act, § 7, 52 Stat. 1063, 29 U. S. C. § 207, apply only to those who are "employees" and to "employment" in excess of the specified hours; § 3 (g), 29 U. S. C. § 203 (g), provides that " 'employ' includes to suffer or permit to work."

Here, too, the employer interprets former opinions of the Court as limitations on the Act. It cites statements that the Congressional intent was "to guarantee either regular or overtime compensation for all *actual work* or employment" and that "Congress here was referring to work or employment . . . as those words are commonly used—as *meaning physical or mental exertion* (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business" (italics supplied). *Tennessee Coal, Iron & R. Co.* v. *Muscoda Local,* 321 U. S. 590, 597, 598. It is timely again to remind counsel that

words of our opinions are to be read in the light of the facts of the case under discussion. To keep opinions within reasonable bounds precludes writing into them every limitation or variation which might be suggested by the circumstances of cases not before the Court. General expressions transposed to other facts are often misleading. The context of the language cited from the *Tennessee Coal* case should be sufficient to indicate that the quoted phrases were not intended as a limitation on the Act, and have no necessary application to other states of facts.

Of course an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity. Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer. Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case.

That inactive duty may be duty nonetheless is not a new principle invented for application to this Act. In *Missouri, K. & T. R. Co.* v. *United States,* 231 U. S. 112, 119, the Court held that inactive time was to be counted in applying a federal Act prohibiting the keeping of employees on duty for more than sixteen consecutive hours. Referring to certain delays, this Court said, "In the meantime the men were waiting, doing nothing. It is argued that they were not on duty during this period and that if it be deducted, they were not kept more than sixteen hours. But they were under orders, liable to be called upon at any moment, and not at liberty to go away. They were none the less on duty when inactive. Their duty was to stand and wait."

We think the Labor Standards Act does not exclude as working time periods contracted for and spent on duty in the circumstances disclosed here, merely because the nature of the duty left time hanging heavy on the employees' hands and because the employer and employee cooperated in trying to make the confinement and idleness incident to it more tolerable. Certainly they were competent to agree, expressly or by implication, that an employee could resort to amusements provided by the employer without a violation of his agreement or a departure from his duty. Both courts below having concurred in finding that under the circumstances and the arrangements between the parties the time so spent was working time, we therefore affirm.

*Affirmed.*